[Civ. No. 2356.   Fourth Appellate District.—August 25, 1939.]

ARANKA LARSEN, as Administratrix, etc., Appellant, v. H. H. VAN DIEKEN et al., Respondents.

Claude L. Chambers and George Westover for Appellant.

Stearns, Luce, Forward & Swing for Respondents.

HAINES, J., *pro tem.*—On December 29, 1936, the decedent Fred Larsen and the present appellant Aranka Larsen, then being husband and wife, entered into a written agreement reciting that differences had arisen between them rendering it impossible for them to continue to live together in that capacity and that it was their mutual desire to effect a settlement of their property rights and of all matters relating to their support and maintenance. The agreement went on to provide for the conveyance by Larsen to his wife of certain real property and furniture ·and, reciprocally, for her relinquishment to him of all her rights in certain other furniture and provided generally, that, except as stated, each party acknowledged that all property of every kind and character, "now held or which may be hereafter acquired by the other, shall be and is his or her sole and separate property and estate". By the further terms of the writing Mrs. Larsen undertook to waive all claim to support and maintenance from her husband and each party undertook to relinquish all right of inheritance in the estate of the other. It appears that at this time Larsen, who was a retired sea captain, was nearly

80 years old and his wife in her middle fifties; that they had been married only for something like three years, Larsen having theretofore been a widower.

The respondent H. H. Van Dieken (hereinafter referred to simply as Van Dieken) and Fannie Van Dieken are husband and wife. Respondent Marjorie S. French is the daughter of the Van Diekens and resides with them. Respondent Roy French is her husband. On January 2, 1937, Larsen signed, acknowledged and delivered to Van Dieken three grant deeds, in their terms absolute, in favor of Mrs. French, conveying to her sundry parcels of land in the city of San Diego. These had apparently belonged to Larsen prior to his marriage to appellant and were included among the properties recognized as his in the property settlement. On them were some three houses. These deeds Van Dieken recorded on January 11th. On January 15th Larsen executed two other deeds, one affecting two vacant lots near La Jolla in said city in favor of Mrs. French and one affecting two other vacant lots there in favor of a daughter-in-law of Mrs. Larsen. Of these two deeds the former was delivered to Van Dieken who shortly afterward recorded it. The effect of these two conveyances was to divest Larsen of all record title to any real estate whatever.

Larsen having died on August 2, 1937, and a document propounded as his will having, for technical reasons, been rejected, appellant sought and obtained appointment as administratrix of his estate, and, having qualified as such, thereafter, as such administratrix, commenced the present action against the respondents to obtain a decree declaring all the real property so transferred and conveyed to Mrs. French, as well as certain personal property in the hands of Mrs. French and of Van Dieken respectively, to have been held in trust by them for the decedent and his estate; to obtain an accounting for the same and the income therefrom and to obtain declaratory relief generally with respect to the effect of such conveyances and transfers.

The respondents in due course answered, the case was tried, findings made and judgment passed determining that the conveyances and transfers above recited invested Mrs. French with the absolute title to the real property affected, except as to a life estate in the income therefrom reserved to said Fred Larsen which terminated at his death, and determining

further that the personal property in the hands of Mrs. French and Van Dieken respectively had been voluntarily transferred to them by Larsen and that they were the owners thereof. The evidence is brought up at large in the present record. It is claimed that it is insufficient to justify the findings and we are asked to reverse the judgment accordingly.

The complaint had alleged that for some years before his death Larsen had been in failing health; that during the last year and a half of his life and for some time prior thereto, by reason of his age and physical condition, his mental faculties had become so impaired that he was easily influenced by those in whom he had confidence; that Van Dieken was a shrewd, experienced business man and had for many years been a member of the same fraternal order with Larsen and had acquired an accurate knowledge of the latter's financial affairs and property interests. It was with great elaboration alleged that the respondents conspired together to obtain possession of Larsen's property, said to have had a total value of about $8,000 and to have yielded an income of approximately $50 a month. It was claimed that respondents' proceedings began with a studied and successful attempt to alienate Larsen's affections from his wife and to bring about a property settlement and separation between them. It was further claimed that respondents took advantage of Larsen's decrepitude and of his alienation from appellant, largely induced by themselves, and of his childish yearning to obtain from the public some sort of old age pension, and by adroit suggestions prevailed on him "to appear to divest himself of all his said property and to effect the property settlement" with appellant, "ostensibly to the end that he . . . might thus appear to have no property and thus be eligible to a state old age pension but actually to the end that they", that is, respondents, "might thereby wrongfully gain present control and subsequent possession and ownership of said property . . . together with the income therefrom, for themselves", in fraud of the rights of those interested in Larsen's estate and without adequate consideration.

These allegations, so far as they reflected upon respondents or their conduct were all denied by them in their answer and found to be untrue by the court.

So far as the activities attributed to the respondents in fomenting ill feeling between the Larsens and bringing about

the property settlement and separation between them were concerned, the evidence in support of appellant's assertions consists for the most part of her own testimony. According to her account Van Dieken posed alternately as a confidant both of herself and her husband, during which time the latter had an obsession that she was trying to poison him and frequently absented himself from home, when there refused to eat what she cooked, and from time to time told her that she was a "gold digger". She said that on the day that the property settlement was signed she went, at her husband's insistence, to Van Dieken's office with him where she found Van Dieken and a lawyer named Dukette with whom he officed; that the agreement was placed before her and represented by Mr. Dukette as a mutual arrangement whereby whichever spouse should survive should have certain property left by the other; that her husband demanded that she sign it, saying that otherwise she would get nothing, and that Van Dieken told her to sign it; that she signed it without reading it. On cross-examination, however, she admitted that before signing it she took it across the street to the office of Mr. Mott, an attorney, in the Spreckels Theatre Building, and showed it to him and that his only remark was "you better go and get the divorce". She said that she was excited and did not discuss the signing of the property settlement with Mr. Mott although that was her purpose in taking it to him. It was after this interview with Mr. Mott that she returned and signed it. She said that she continued to live with her husband until January 7, 1937; that in the meantime he discouraged her from reading the settlement agreement, but on that day required her to leave and threatened in case she refused, to have the sheriff oust her. She testified that while she and her husband were living together Mrs. Van Dieken called her up by telephone, inquired for her health, and abused her husband, telling her that nobody could get along with him and that she would do better to leave him; that Van Dieken soon after the property settlement had been signed called her up and advised that she divorce her husband and said that he could arrange to have it done for $25, which sum she didn't have; that he promised to talk to his lawyer and get him to reduce the cost to $15.

As against appellant's account Van Dieken, while he conceded that both Larsen and appellant from time to time dis-

cussed their troubles with him, claimed also to have tried to keep them together, and to have advised Larsen not to apply for a divorce but to make the best of the situation. As respects the separation agreement he claimed to have known nothing about it until Mr. Dukette called him into the latter's part of the office which they were occupying. There, he said, he found Mrs. Larsen, and the agreement already signed by her, and was merely asked as a witness to initial the paper, which he did. Otherwise he claimed to have had nothing to do with the transaction and said that he doesn't even remember that Mr. Larsen was present at the time.

As respects the property settlement, Mr. Dukette, the attorney referred to, testified that he was acting for Larsen who had consulted him in the preceding spring about filing a divorce complaint against appellant; that the complaint had been prepared and sworn to but not actually filed. Both Mr. and Mrs. Larsen, according to Dukette, from time to time called at his office during this period and, at that time, Van Dieken advised Larsen to drop the divorce for "the time being and go back and try it again", and on Larsen's instruction the matter was held up. According to Dukette's testimony Larsen came back in December of 1936 and again consulted him. Mr. Dukette testified that he advised a property settlement rather than a divorce; that Mrs. Larsen came in on December 24th; that he talked with both the Larsens in his office, at which time the terms of settlement were verbally agreed upon; that he suggested to Mrs. Larsen that she get her own attorney but she expressed herself as satisfied with what he was doing. He said that, according to his impression, she came in again on December 28th and took out the paper with her overnight, although he is not sure about that. At any rate he said that on December 29th it was submitted to both the Larsens; that Mrs. Larsen insisted on having certain personal property, provision for which he interlined at her request; that she said she didn't believe she would sign it because she didn't think she was getting enough, whereupon Mr. Larsen said he would give her another piece of property so that her income would be greater than his, which was arranged; that he, Dukette, made it clear to her that she would get nothing additional at her husband's death; that Van Dieken had, up to this time, had nothing to do with the matter but was called in merely as a witness. Mrs. Van Dieken

testified that she never had any telephone conversation at any time with Mrs. Larsen and never discussed Mr. Larsen with her.

With respect to the execution of the deeds to Mrs. French it was Van Dieken's testimony that Larsen came into his office late in the morning of January 2, 1937, and said to him, "I want you to make out three deeds for me"; that Larsen had some old deeds with him and that he copied them. Larsen, according to Van Dieken's testimony, instructed him to make out the new deeds to Mrs. French. When they were completed he took Larsen in to Mr. John H. Moore, an attorney and notary public, who also officed in the same suite, to have the deeds acknowledged, which was done. Van Dieken said that he had had no previous conversation with Larsen about deeding any property to his daughter and that nothing was said between himself and Larsen in connection with the matter about the subject of old age pensions; also that he had had no previous talk with either Mrs. Van Dieken or Mrs. French about these conveyances. Van Dieken testified that, as already recited, he recorded the deeds. He said that on either January 11, 1937, or January 15, 1937, he is uncertain which, Larsen again came in and instructed him to make out the deeds for the lots near La Jolla, that is, the one to Mrs. French and the other to Mrs. Larsen's daughter, Catherine (the reference is really to her daughter-in-law); that at Larsen's suggestion they then went across the street to Joe L. Shell, now one of the Municipal Court judges, but then a Justice of the Peace, to have him take the acknowledgments; that Judge Shell said that, being on the bench, he could no longer act as a notary, but directed them to one Virginia Gore, who did take the acknowledgments to these deeds, one of which Van Dieken said that he then mailed to Mrs. Larsen's daughter (daughter-in-law), while he recorded the one to his own daughter. This testimony about what occurred in Judge Shell's presence is confirmed by Judge Shell's testimony.

Mr. Dukette testified that on January 2d as Van Dieken was making out the three first deeds he, Dukette, passed through the outer office where Van Dieken was and that in Larsen's presence Van Dieken said to him, "Mr. Larsen is giving Marjorie, my daughter, some property, and do you think I should put in Marjorie's husband's name?" Mr.

Dukette replied that he thought the deed should read to the daughter as her separate property, and passed on.

Mrs. French testified that she was and is a teacher in the San Diego City schools; that Larsen had been a close friend of her family both before and after his marriage and had been often at their home; that she had known him for 15 or 20 years; that she first learned of Larsen's intention to deed her his property when her father, on coming home after the deeds were executed, told her about the occurrence. According to her testimony, "After the deeds were turned over, he", that is, Larsen, "came to my home and told me that he had deeded his property to me and that I was to turn over the rents to him". This, she thinks, may have been two or three days after she first learned that the deeds had been made. The deeds came to her from the recorder's office after recordation. She had not seen them before. She said that the agreement between Larsen and herself was substantially that she was to collect the rents and look after him. "At present I was to give him the rent and then we were going to go into that later on, which we did." She said that Mr. Larsen took her out to the three houses and introduced her to the several tenants as the new landlady and instructed them thenceforth to do business with her; that from some time shortly after receiving the deeds she proceeded to collect the rents, which after deducting expenditures, were from time to time either turned over to Mr. Larsen or applied by her or through the agency of her father to Larsen's expenses up to the time of death. A Mrs. Meyers and a Mrs. Peterson, two of the tenants who testified at the trial, in substance confirmed the statement that Larsen told them to pay the rent to Mrs. French. Mrs. French named a Mrs. Wilde as one of those whom Larsen had instructed to pay the rent to her. According to Mrs. Wilde's testimony it was not Larsen but Mrs. French who so instructed her. There is to that extent, therefore, a conflict in their accounts. A tenant named Durloo testified that Larsen told him to pay the rent to Mrs. French and her husband, who, he said were good friends of his. "They were going to collect it and look out for it. He said he wasn't yet too old to run around himself and would probably go north". He claims that Larsen later talked about selling the property to him and that he asked Mrs. French

about it and she said that it was Larsen's property but that she could handle it.

We think that the foregoing statement fairly summarizes the testimony in so far as it bears directly on the charge that the respondents were guilty of fraud and used undue influence to procure the conveyances of the real estate to Mrs. French. It is clear that if this evidence is to be considered by itself alone, the trial court was strictly within its rights in resolving any conflict that it might be deemed to present in respondents' favor and that the court's determination that no fraud was practiced and no undue influence used is one with which it is not our function to interfere.

Appellant, however, introduced a mass of testimony respecting other occurrences to some extent before and to some extent after these conveyances, the effect of which is apparently relied upon as raising such inferences as to compel an opposite conclusion.

There seems to be no question that Larsen had made up his mind, in one way or another, to secure such old age benefits as he could from the public. Mrs. Larsen testified that the Townsend Plan was a constant theme of his conversation. One Golden, a real estate man with whom Larsen had listed his property, testified that during 1936 Larsen talked to him about the Townsend Plan; that he told Larsen that he had too much property to come under it; to which Larsen answered that he had a way of getting rid of his property; that he was going to get that $200; that he was going to get the property out of his name. Finding no immediate prospect of getting anything from that source, Larsen apparently turned his mind to securing an indigent pension from the state, notwithstanding that he was already in receipt of a fair income of his own. A. V. Goeddel, a fellow member of the Eagles fraternity and secretary of its local association, testified to a conversation with Larsen in December of 1936. He said that at that time Larsen first asked him to help in the sale of his property, then suggested he would like to have Goeddel take it over and finally asked Goeddel if he, Larsen, could get an old age pension if he could get his property out of his name. One Howell, also a fellow member of the Eagles, testified that about Thanksgiving of 1936, Larsen had come over to his shop and asked him to take over his, Larsen's, property, and said that he, Larsen, would proceed to get an

old age pension. Howell says that his answer was that if he were to take over the property and collect Larsen's rents and Larsen were then to apply for an old age pension it would land both of them in jail.

Mae Angelo, a social worker and supervisor in the San Diego County Welfare Department, testified that Larsen about February 10, 1937, came into her office and made affidavit to an application for an old age pension, a copy of which appears in the record, wherein he stated that he had made no assignment of his property in order to qualify for old age security, and that he did not own real property in excess of $4,000 or personal property in excess of $500. She said that the statements that went into the application were not made directly to her but to a Miss Hebb, who is a case worker in her department. Miss Hebb testified that Larsen was in first on February 9th and again on February 10th, and claimed that he had no bank account or securities; that Mrs. French had foreclosed a mortgage that she held on his home and that he had since been living on his savings, of which he had only $75 left.

There is no dispute about the fact that after his separation from his wife, Larsen, until the middle of the following March, lived at hotels, that is, first at the Golden West and then at the Lindbergh Hotel in San Diego; neither is there any dispute that he entered the County Hospital on March 16, 1937. A Mrs. Pasich, housekeeper at the Lindbergh Hotel, testified that shortly before he went to the hospital she talked with him and that he then told her that his friends advised him to go to the County Hospital to cut expenses and that he was trying to do that because he had signed all his property over to his friends and had nothing and wouldn't need to pay the County Hospital bill; also that he said he had signed his property over to his friend or his friend's daughter, who was going to get a pension for him; that when he got the pension he was then going to get the property back so he could live better on his money. She also claims to have heard Van Dieken tell Larsen while the latter was sick in bed at her place that he was better off than those at home since Mrs. Larsen might poison him and was a ''bad egg''.

One Alma S. Gardner, a social worker employed by the county at the County Hospital for the purpose of interviewing incoming patients who were not able to pay their way,

stated that on March 16, 1937, Larsen came to the hospital with Van Dieken, who was present during the interview; that she followed the regular routine of questioning; that Larsen said he was divorced from his second wife and had made application for an old age pension but action on it had not been completed; that he had no automobile, no property, no savings, owed no debts and carried no insurance; that he was entirely dependent on his friend Van Dieken who was taking care of him, had secured a little room for him and was providing him with means for his meals; that he had had marital difficulties and had been set out at home and, being penniless, had turned to his friend Van Dieken. She says that Larsen stated that about three years before he had married a younger woman; that he presumably did not die as soon as she expected; that she mortgaged his property consisting of two houses, then took all the assets available and set him out literally on the street. She testified that Van Dieken had v fied these various statements and Larsen's entire dependen upon him.

It appears without conflict that on March 18, 1937, that is two days after he had entered the County Hospital, Larsen signed the will already alluded to in this opinion, at the County Hospital, wherein he undertook to devise and bequeath to Van Dieken all property which he might own at the time of his death, and to nominate Van Dieken as his executor. Van Dieken claims that Larsen had talked to him about this will in his office just before entering the C Hospital and that he, Van Dieken, had prepared it in cordance with Larsen's instructions. At all events there no dispute that Van Dieken took it to the hospital himse and that Larsen's signature was there affixed to it.

The testimony shows that Larsen remained in the County Hospital in a progressively weakening condition until the following summer. Mrs. Larsen has testified at great length about repeatedly seeing him there and about expressions made by him to her about wishing to resume their relations, and complaints on his part of his treatment at the hands of respondents. She says that, among other things, he complained that he was not allowed to see his friends, and says that the nurses discouraged her visits. Sundry of his friends, did, however, visit him, including Mr. Goeddel of the Eagles' Hall. One Ethel Prihoda, a daughter of appellant, testified that she

visited Larsen at the County Hospital and that he asked her to collect his rents for him, expressed discontent at being there and affection for her mother. It was shown that during this period Mrs. Larsen consulted Mr. Van Winkle, an attorney, about the advisability of getting a divorce from her husband, but that he advised her in substance that as her husband apparently would not live long it was not worth her while. At length Mrs. Larsen brought another attorney to the hospital to interview him. Soon after that Van Dieken arranged for his transfer to a private institution known as Frazer Hall where his bills were paid from the rental collections made by Mrs. French. Meanwhile Mrs. Larsen filed an application in the Superior Court to be appointed his guardian. This, she testified, was according to Larsen's direction. However, under date of July 6, 1937, Larsen signed a nomination prepared by Van Dieken and witnessed by two of the nurses at Frazer Hall, requesting the appointment of Van Dieken as his guardian. Van Dieken testified that Larsen had been served with notice of his wife's application and told him that he did not want her made guardian but that he did want Van Dieken appointed.

It may be conceded that there are aspects of the evidence recited, which do indicate that Van Dieken by the spring of 1937 was not at all reluctant to humor Larsen in his plan to get money from the public, and was guilty of highly reprehensible conduct, especially in connection with Larsen's admission to the County Hospital. It may also be conceded that Van Dieken may have been anxious to keep Larsen, as he grew more and more feeble, from getting under the control, either of Mrs. Larsen or of anyone else who would be likely to attack the conveyances made in January of 1937. Assuming, however, that these are correct interpretations of Van Dieken's conduct, it still would not necessarily relate back to or characterize what occurred in the making of the conveyances themselves nor charge Mrs. French with complicity in any prearranged plan to induce their execution, and we cannot say that the trial court was wrong in the view which it apparently took that, whatever Van Dieken's conduct may have been, it raised no necessary inference that he had defrauded Larsen or used any undue influence to secure the conveyances themselves.

■ As respects Larsen's personal property, it included the furniture in one or more of the three houses conveyed to Mrs. French, an old automobile apparently of little substantial value, a trunk which, according to Van Dieken, contained only a little clothing, a few personal effects; and the contents of a box maintained by Larsen at the Eagles' Hall at San Diego. As respects the furniture Mrs. French has treated it as having been intended to go to her with the house or houses that contain it. The automobile is at Van Dieken's home, whether it be said to be there in the possession of Mrs. French or of Van Dieken. Van Dieken testified that half an hour before Larsen went to the hospital he gave him a key to the trunk and asked him to take care of everything, saying, "If I don't get better everything belongs to you"; that accordingly he got the trunk from the Lindbergh Hotel and took it home. As to the deposit box Goeddel testified that Larsen himself opened it during the first ten days of March, 1937, which would be shortly before he went to the County Hospital. This visit of Larsen to the box is confirmed by Miss Rossi, the immediate custodian of the box there. A bank pass-book which had been in the box was produced in court and showed a withdrawal of $900 on or about March 1st. This must, apparently, have been made by Larsen himself. Van Dieken testified that he knew nothing of this withdrawal and knows nothing of the disposition of the money withdrawn, and there is no evidence tending to show that he had any connection with either. He did have Larsen's key to the box later, after Larsen had gone to the hospital, and according to his testimony he went to the box, took out the contents and delivered the same to Larsen at the hospital. He says that Larsen handed these back to him and told him that they were to be his, that he kept them in his safe a while and then turned them over to his attorney. He says that he found no money.

As to the furniture, we must presume in support of the trial court's findings that it believed it to have been Larsen's intention that it should go to Mrs. French with the house or houses containing it; and as to the other personal property in respondents' hands, if the trial court believed, as it had the right to believe, what Van Dieken testified that Larsen said to him about it just before going to the hospital and while there, the result, assuming that Larsen was at the time

*compos mentis,* would amount to a gift *causa mortis.* (Civ. Code, sec. 1149.)

■ Appellant's counsel, under the authority of such cases as *Herbert* v. *Lankershim,* 9 Cal. (2d) 409, 471 [71 Pac. (2d) 220], insist that the rule forbidding disturbance of a trial court's findings when the evidence conflicts "does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence". ■ It is urged that Van Dieken occupied a confidential relation toward Larsen and that even though his daughter occupied no such relation it is the law that:

"An innocent recipient of a gift procured through the fraud of a third person can not set up his innocence as a defense to an action by the donor to rescind the gift on account of the fraud" (citing *Simmons* v. *Briggs,* 69 Cal. App. 447 [231 Pac. 604]).

With the propositions of law thus laid down we are in accord, but we do not think that they here control. ■ Van Dieken's relation to Larsen could, prior to the transactions of January, 1937, hardly be said to be, in any strictness, confidential. He was, at most, a close friend. If the trial court believed, as it had the right to believe, that Larsen's estrangement from his wife was real, there would have been nothing particularly unnatural in his desiring that after he was through with his property it should belong wholly to Mrs. French, whom he had long known. As to his determination to get an old age pension, there is abundant evidence in the record that it was a fixed idea of long standing with him about which he talked to various persons other than Van Dieken. The evidence was manifestly not such as to compel the trial court to believe that Van Dieken had implanted this idea in his mind. While there is much in Van Dieken's later conduct that is far from creditable, it should not be forgotten that what the trial court had to deal with, so far as the real estate transactions were concerned, was not what happened at the County Hospital or at Frazer Hall but what occurred in January, 1937, or theretofore. As respects the personal prop-

erty, while the gifts *causa mortis* found to have been made were, indeed, of later date than the real estate conveyances, yet they too are said to have been relatively early and they are not in the circumstances entirely incredible, nor does the property affected by them appear to have had any considerable value.

The trial court, of course, had before it not only the issue of fraud and undue influence just discussed, but also the question whether Larsen at the respective times when he executed the deeds to Mrs. French, and is said to have made the gifts *causa mortis* of his personal property to Van Dieken, had the mental capacity necessary to give validity to his conduct. On that subject the testimony exhibits a wide difference of views, both between his close acquaintances and between the medical experts called to express their opinions. No useful purpose would be served by reciting this evidence here in detail. That he was rapidly failing both physically and mentally is patent enough, but how far the deterioration of his mind had proceeded at any given time was a question for the trial court to decide. Its determination that he had the mental capacity to do what it is found he in fact did in respect of these conveyances and personal property gifts, finds enough support in the record to require us to uphold it.

There is, indeed, a certain vagueness about Larsen's statements to Mrs. French, recounted by her, about what he wanted her to do with the property which he had deeded to her. The trial court has construed the arrangement as one for the retention by him of a life estate in the income. If we are to sustain, as we must, the trial court's findings on the issues of fraud, undue influence and mental capacity, its construction of the effect of what was done is hardly one of which Larsen or his personal representatives, in view of the absolute language of the deeds, can well complain.

■ We may add that so far as the property settlement between Larsen and his wife is concerned, we do not see that Mrs. Larsen in her capacity as administratrix of the decedent's estate has any standing here to complain of it. Mrs. Larsen is not here suing in her personal capacity and so far as her husband's estate is concerned *it* could gain nothing from having that transaction set aside. No proceeding appears to have ever been taken to rescind it and it figures in

the instant case only for what light it sheds on the other matters that are really here involved.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.